UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOSE ORRACA (93-A-9300),                                   **DECISION AND ORDER**

                                    Plaintiff,                   10-CV-00840-JJM

v.

AUGUSTINE, et al.,

                                    Defendants.

_____

       In accordance with 28 U.S.C. §636(c), the parties have consented to jurisdiction

by a United States Magistrate Judge [36].[1]  Before me is defendants' motion for summary

judgement [59].   For the following reasons, the motion is granted in part and denied in part.


**BACKGROUND**

       Plaintiff, an inmate, commenced this action *pro se* pursuant to 42 U.S.C. §1983

against various correction officers employed by the New York State Department of Corrections

and Community Supervision ("DOCCS").  His alleged Eighth Amendment claims arise from two

incidents occurring on February 1 and 18, 2010, while he was incarcerated at Southport

Correctional Facility. Complaint [1].[2]

---

    [1]     Bracketed references are to the CM/ECF entries.

    [2]     Plaintiff's claims against defendants arising from the alleged preparation of false misbehavior reports and his claims against defendant Wetmore were previously dismissed, with prejudice. *See* Order dated February 17, 2011 [4].

**A.      The February 1, 2010 Incident**

Beyond the allegations of the Complaint, there is little in the record concerning this alleged incident.  Plaintiff's Complaint [1] alleges that when he arrived at Southport, defendant Richard Cecce[3] made sexual advances toward him and tried to get him to move to the third floor of the facility, where he "would be taken care of nicely", but plaintiff denied those advances (id., ¶¶15, 17).  Plaintiff testified that although he was subject to a medical permit that restricted him to a floor level, upon returning from a court trip on January 29, 2010, he was moved to the third floor of A-Block.  Sleight Declaration [61], Ex. Q, pp. 17-19, 22. When plaintiff complained to a Sergeant about this move, the transfer was stopped and he was returned to his medical unit cell on B-Block (id., pp. 20-21, 23).  Following this incident, plaintiff's Complaint alleges that Cecce told him, "you made me look bad . . . you're going to pay for it", and then assaulted him on the way to the shower on February 1, 2010, and charged with him with a false misbehavior report.  Complaint [1], ¶¶19, 28.


**B.      The February 18, 2010 Incident**

Plaintiff testified that on February 18, 2010, defendants Drew Onifer and Brian Crawford escorted him to the third floor. Sleight Declaration [61], Ex. Q, pp. 35, 37.  While in the hallway of the third floor in front of the cells, defendant Richard Augustine made a sexual advance toward plaintiff and when he declined these advances, defendant Augustine "crushed [his] his head against the wall", causing a laceration (id., pp. 35-38).  Plaintiff was then

---

[3]      Whereas the Complaint identifies him as "Ceccee", I have followed the spelling used by defendants.

"drag[ged]" from the hall into the shower room on the third floor (id., p. 39).  According to

plaintiff, no other inmates on the floor could see into the showers from their cells, but the cells

were in close enough proximity that the inmates in those cells could hear what was occurring in

the shower room (id., p. 40).

      Plaintiff initially testified that when he entered the shower room, he was thrown to

the floor, but then clarified that he threw himself on the floor "because I knew where they were

going" (id., pp. 40-41).  He testified that he was then set on a bench and defendant Augustine

unzipped plaintiff's pants and performed oral sex on him while defendant Onifer performed anal

sex on defendant Augustine (id., pp. 40-44).  Defendants Augustine and Onifer then switched

positions (id., p. 46).  While the alleged assault was occurring, plaintiff testified that defendant

Crawford was "very agitated", "calling them all kinds of names and saying . . . he wasn't going to

lose his job over their dirty fantasies" (id., p. 48). The incident eventually ended when defendant

Crawford said that a "sergeant [was] coming or something" (id., p. 48).  According to plaintiff,

the incident lasted approximately 20 to 25 minutes (id., p. 47).

      On the date of the alleged sexual assault, plaintiff was issued a misbehavior report

by defendant Augustine charging him with refusing a direct order and with making threats.

Sleight Declaration [61], Ex. C, Bates No. 001486.  Although defendant Cecce was not present

for the alleged February 18, 2010 incident, plaintiff's Complaint [1] alleges that he "set[] [him]

up to be sexually assaulted on February 18, 2010" (id., ¶28).

To contradict plaintiff's version of events, defendants rely solely on the various reports prepared following the alleged incident.[4]  These reports indicate that on February 23, 2010, plaintiff first reported to Denise Fuller, LCSW-R, that he had been raped. Sleight Declaration [61], Ex. E, Bates No 001598.  The memorandum prepared by Ms. Fuller states that plaintiff "would not provide any additional information, indicating 'I just need you to report this to Security'" (id.).  On February 24, 2010, Captain Harry Hetrick prepared a memorandum to the Deputy Superintendent of Security ("DSS") Sheahan, indicating that while plaintiff was in his cell on February 23, 2010, he initially reported that "he had been sexually abused by staff in the A-12 shower, 5 days ago, and that C.O. Fluman had watched while 2 other C.O's abused him" (id., Ex. F, Bates No. 001597).  Captain Hetrick also reported that when he and Kim Frey, LCSW-R, later interviewed plaintiff in an interview room, he stated that "C.O.'s Augustine and Onifer had physically abused him in the A-12 shower, while C.O. Crawford watched . . . . [and] that C.O. Crawford wanted no part of it" (id.).  Ms. Frey's report of this interview (id., Ex. G, Bates No. 001599) is very different:

> "Initially [plaintiff] indicated he was sexually assaulted on February 22, 2010, however he quickly altered this time frame to February 18, 2010 noting it occurred when he received his latest ticket.  Mr. Orraca initially stated that the assault occurred while he was being brought from B block to A block however, he immediately changed the locale of the assault occurred to the Unit Shower.  [Plaintiff] indicated that CO Onofer . . . and another CO whom he could not name, (but did physically describe) were responsible for his being sexually assaulted.  A third CO was

---

[4]     Plaintiff argues that  defendants do "not dispute that [he] was assaulted". Plaintiff's Affidavit [68], ¶6. This prompted dependants, as part of their reply, to submit  declarations from defendants Crawford, Onifer and Augustine denying that the February 18, 2010 incident occurred [71-73].

named by Mr. Orraca as a non-participant observer to the assault" (id.).

Following plaintiff's interview with Captain Hetrick and Ms. Frey, he was taken to the infirmary for an examination (id., Exs. F and G). The February 23, 2010 Ambulatory Health Record Progress Notes from that examination state that plaintiff "refused any medical care or examinations", and reported to Ben Oakes, RPA-C that "2 officers approached him asking for sexual favors . . . [and] they held their penises out, but there was no sexual contact. After he declined to participate, . . . the 2 officers engaged in sexual activities [and] forced him to watch. He is unsure of the officers names that were involved" (id., Ex. I, Bates No. 000157). In a memorandum dated February 23, 2010, Mr. Oakes advised Captain Hetrick of what plaintiff reported (id., Ex. H, Bates No. 001600). At his deposition, plaintiff explained that he declined medical care and an examination, "[b]ecause I'm not letting nobody touch[ ] my penis again . . . . Even the medicals are homos". Sleight Declaration [61], Ex. Q, p. 53.

Defendants also rely upon a February 25, 2010 memorandum from DSS Sheahan to plaintiff, which states, in relevant part: "during my rounds on 2/24/10 I had a conversation with you concerning the allegations. At that time you conveyed to me that your allegations were false and that you registered them due to receiving a falsified misbehavior report from staff". Sleight Declaration [61], Ex. K, Bates No. 001596.[5] Notwithstanding the varying accounts initially provided by plaintiff, defendants concede that at the February 25, 2010 Tier III

---

[5]     Although plaintiff does not specifically address DSS Sheahan's February 25, 2010 memorandum in his response, the excerpts of plaintiff's deposition transcript attached to defendants' motion (Sleight Declaration [61]. Ex. Q) suggest that he may have denied making certain statements to DSS Sheahan (id., p. 57). The Complaint [1] also alleges that DSS Sheahan's February 25, 2010 memorandum was retaliatory (id., ¶21).

disciplinary hearing arising from the February 18, 2010 misbehavior report (Sleight Declaration [61], Ex. D.  Bates Nos. 001509-1511), plaintiff described the February 18, 2010 incident consistently with what is alleged in his Complaint. *See* Defendants' Memorandum of Law [62], p. 8 of 11 ("When he got to his disciplinary hearing on February 25, 2010, he told the story that appears in his Complaint").

In response to defendants' motion, plaintiff does not dispute or explain the conflicting accounts he allegedly provided concerning the February 18, 2010 incident.  Instead, he states that inmates "Anthony Jones . . . Omar Rivera . . . and Carlos Goris . . . witnessed different parts of the assault . . . [and] request[s] the[se] witnesses to be present at trial and Jamie Lamphear".  Plaintiff's Affidavit [68], ¶11.  Although captioned as an "Affidavit - of service", plaintiff attaches to his opposition what appears to be a declaration from Anthony Jones,[6] an inmate, dated February 3, 2011, stating:

> "[O]n or about February 18, 2010 I was housed on A-12-15 cell and I was present when Jose Orraca . . . arrived at A-12-19 cell and before he entered his cell Officer Augustine . . . was searching Inmate Orraca's cell and confiscating some personal property from Orraca's cell.  Orraca requested that the officer produce a contraband receipt for the papers and property that Augustine was confiscating.  At that time an officer not known to me push Orraca's face against the wall in a violent manner . . . . [T]he officers walked Orraca to the showers and there was lots of loud noises coming out of the shower, I didn't see what took place inside of the shower but judging by the screams crys of Orraca something was not right at all". [68-1], p. 1 of 3.

---

[6]    The document is also signed by "Will Smith", but it is unclear whether that individual was attempting to act as the notary public.

## ANALYSIS

**A.**     **Summary Judgment Standard**

It is well settled that "[s]ummary judgment is appropriate only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Rivera v. Rochester Genesee Regional Transportation Authority, 702 F.3d 685, 693 (2d Cir. 2012). "An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011), cert. denied, __ U.S.___, 132 S.Ct. 1744 (2012) (*quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50.

However,  "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment". Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).  Thus, generally, "[t]he evidence of the non-movant is to be believed". Anderson, 477 U.S. at 255.  It is only "in the *rare circumstance* where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," that the court may conclude that no reasonable jury would credit the plaintiff's testimony. Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (emphasis added).  Nevertheless,

"courts should not engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment". <u>Rivera</u>, 702 F.3d  at 693.


**B.      The February 1, 2010 Incident**

Defendants seek dismissal of this claim, arguing that plaintiff  failed to exhaust his administrative remedies.  Defendants' Memorandum of Law [62], Point I.  As defendants note in their reply, plaintiff  "does not deny that he never filed a grievance in connection with the alleged assault by Defendant Cecce on February 1, 2010".  Sleight Declaration [69], ¶5.  Indeed, plaintiff's response fails to even acknowledge, much less address, defendants' argument that he failed to exhaust his administrative remedies with respect to the alleged February 1, 2010 excessive force incident. Therefore, I grant this portion of defendants' motion. *See* <u>Miles v. Levac</u>, 2014 WL 1338808, *3 (W.D.N.Y. 2014) (Skretny, J./McCarthy, M.J.) (dismissing deliberate indifference claims that there not addressed in the *pro se* plaintiff's opposition to the defendant's motion for summary judgment); <u>Smith v. Riccelli Brokerage Services, LLC</u>, 2011 WL 2007209, *5 (W.D.N.Y. 2011) (Skretny, J.) (The *pro se* "[p]laintiff does not respond to Defendants' argument in her memorandum of law, thus it appears she concedes there is no aider and abettor liability"); <u>Felske v. Hirschmann</u>, 2012 WL 716632, *3(S.D.N.Y. 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them").


**C.      The February 18, 2010 Incident**

Defendants seek dismissal of plaintiff's sexual assault claim, arguing that "[t]he only evidence . . . supporting [plaintiff's] allegation the was sexually assaulted . . . is his own

testimony; he has no hard evidence tending to prove that the assault took place". Defendants'

Memorandum of Law [62], p. 7 of 11. They contend that plaintiff's  version of events should be

disregarded since the "the record before the court is rife with inconsistent and incomplete

accounts by Plaintiff of the alleged sexual assault" (id., p. 8 of 11).

       While defendants rely heavily on the reports of Mr. Oakes, Ms. Fuller, Captain

Hetrick, Ms. Frey, and DSS Sheahan in establishing that plaintiff's account is not credible, they

offer no affidavits (or declarations) from these individuals authenticating the reports or other

forms of authentication.  Instead, these reports are attached to defendants' counsel's declaration

[61], and he merely represents that they are "true and accurate copies" (see, e.g., id., ¶¶14, 15).[7]

Notwithstanding plaintiff's failure to challenge the authenticity or admissibility of these reports,

they are not sufficiently authenticated to be admissible, and I decline to consider them.  *See*

Dawe v. Corrections USA, 2010 WL 682321, *1 (E.D.Cal. 2010) ("defendants attached

numerous documents produced in discovery as exhibits 'authenticated' by defendants' counsel.

Such authentication is clearly improper because defendant's counsel has failed to demonstrate

any personal knowledge as to the authenticity of these documents, and therefore the court has not

considered them in this motion"); Eaton v. Kindred Nursing Centers West, LLC, 2005 WL

1185802, *8 (D.Me.), adopted 2005 WL 1520799 (D.Me. 2005) ("Although counsel might well

be able to authenticate a copy of a document that is both maintained by the opposing party and is

produced by the opposing party during the course of discovery, it does not appear that in this case

---

[7]    Inexplicably, plaintiff's February 23, 2010 Ambulatory Health Record Progress Note is accompanied by a Certification ([61-1], p. 61 of 92) dated July 11, 2007 - *predating the records it purports to certify by approximately two and a half years*.  Given this significant anomaly, I have disregarded the Certification.

that [the] Attorney . . .  can properly authenticate . . . his client's personnel records"); <u>Jongeward</u>

<u>v. BNSF Railway Co.</u>, 2010 WL 1372696, *3 (E.D.Wash. 2010) ("Plaintiffs' counsel . . .

declares that the copy of the Report, attached to counsel's declaration, is 'true and correct' but

offers no personal knowledge of the document's preparation, as required by Fed.R.Evid. 602.

There are no indicia of authenticity similar to the examples listed in Fed.R.Evid. 901(b), nor is

there the required documentation to be self-authenticating under Fed.R.Evid. 902").

       Moreover, even if I were to consider these reports, I would still conclude that the

record is not so rife with inconsistencies that no reasonable jury would credit plaintiff's

testimony.  While plaintiff may have initially provided a conflicting account to Mr. Oakes and

told DSS Sheahan that he made up the incident, plaintiff's account of the alleged incident has

remained generally consistent since he testified at his February 25, 2010 disciplinary hearing.

Defendants also note that plaintiff initially provided differing dates and locations for the incident

during his interview with Captain Hetrick and Ms. Frey.  Defendants' Memorandum of Law [62],

p. 8 of 11.  Yet, their own accounts of what plaintiff reported during this interview are

inconsistent with one another.  Curiously, Captain Hetrick's report of the interview (Sleight

Declaration [61], Ex. F, Bates No. 001597) does not mention any of the variations in plaintiff's

story identified by Ms. Frey in her account of the same interview (<u>id</u>., Ex. G, Bates No. 001599).

       Defendants further point to the fact that when plaintiff was initially interviewed,

he provided no details of the alleged assault.  Defendants' Memorandum of Law [62], p. 8 of 11.

However, given the nature of the allegations at issue, this is not surprising.  Indeed, even at his

deposition, plaintiff was reluctant to answer certain questions about the incident, explaining,

"[t]his is embarrassing to me . . . . You're not going to put me through that . . . . I don't want to

be mentally disturbed about these dudes".  Sleight Declaration [61], Ex. Q, p. 44.  While

defendants also note that at his deposition, plaintiff's recollection was incomplete (defendants'

Memorandum of Law [62], p. 8 of 11), he explained that during the assault  - "All I'm doing is

staring away, keeping my eyes to the sky.  I'm disgusted."  Sleight Declaration [61], Ex. Q, p. 48.

Although defendants rely on Jeffreys, plaintiff's account of the February 18, 2010

incident, which has generally remained consistent since February 25, 2010, is far less

contradictory than the account at issue in Jeffreys.  In Jeffreys, the plaintiff sought "to recover

damages against several New York City police officers who allegedly assaulted him before

throwing him out of a third-story window" during a burglary arrest. 426 F.3d at 550.  However, it

was undisputed "that on at least three occasions [prior to filing the complaint] he confessed to

having jumped out of the third-story window". Id. at 552.  His signed confession did not contain

any reference to police mistreatment nor did he make any mention of this during his arraignment,

guilty plea, or sentencing.  Id.  It was not until nine months later that the plaintiff first

complained that he had been thrown out of the window (id.), and during the litigation he was

only able to "infer[ ] . . . (due to his lack of consciousness) that one or more of the police officers

must have thrown him out of the window".  Id. at 551.

Here, the conflicting and limited accounts plaintiff gave shortly after the incident

cast doubt on his credibility, but I cannot conclude that no reasonable jury would credit his

testimony.

Defendants further argue in their reply that plaintiff  "submits nothing" from the

witnesses he identifies that supports his claim.  Sleight Reply Declaration [69], ¶7.  This is

incorrect.  As discussed above, plaintiff submits a declaration from Anthony Jones supporting his

account of events [68-1].  While defendants note that plaintiff has never identified Jones as a potential witness (id., ¶8),[8] they do not move to strike the declaration, much less argue that I should not consider it.[9] In any event, even without this declaration, defendants have not established their entitlement to summary judgment.

## CONCLUSION

For these reasons, defendants' motion [59] is granted to the extent of dismissing plaintiff's claim arising from the February 1, 2010 incident, but is otherwise denied.

A conference to schedule further proceedings is scheduled for September 12, 2014 at 11:00 a.m.  Defendants' counsel shall arrange for plaintiff's telephonic participation and counsel may also appear by telephone upon advance notice to chambers. The court will initiate the call.

**SO ORDERED.**

Dated: August 27, 2014

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge

---

[8]      Hindering my review of the record, not all discovery in this case was filed with the court as required by LR Civ. P. 5.2(f).

[9]      Apart from his claims arising from the sexual assault, plaintiff also claims that he was subjected to a physical assault on February 18, 2010 (Complaint [1], ¶¶10, 23, 25-27) and testified that defendant Augustine "[c]rushed [his] head against the wall" causing a laceration.  Sleight Declaration [61], Ex. Q, pp. 38-39. Since this claim is not addressed by defendants' motion, it remains.  In addition to the excessive force claim against Cecce for the February 10, 2010 alleged incident, plaintiff also alleges that Cecce violated his Eighth Amendment rights by "setting [him] up to be sexually assaulted on February 18th 2010". Complaint [1], ¶28.  Since these claims are not addressed by defendants, they remain in effect.